**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 10-142-DLB-JGW**

**ANTHONY GONZALEZ, et al.**                                      **PLAINTIFFS**

**vs.**                          **MEMORANDUM OPINION AND ORDER**

**MICHAEL LUSARDI, et al.**                                      **DEFENDANTS**

\*\*\*   \*\*\*   \*\*\*   \*\*\*

## I.  INTRODUCTION

Plaintiffs commenced this civil rights case against seven City of Covington police officers, alleging claims for excessive force, deliberate indifference, malicious prosecution and violations of their Fourteenth Amendment due process rights, all under 42 U.S.C. § 1983.  Plaintiffs also assert state-law battery claims as well as claims for violations of the Kentucky Constitution.[1]  Finally, Plaintiffs assert a destruction and fabrication of evidence claim, though it is unclear whether they bring this claim under state or federal law.

This action culminated in four summary judgment motions.  Officers Jordan, Gangwish, Fulton, Dames and Weitholder moved for summary judgment on all claims against them.  (Docs. # 63, 64, 66).  Officers Lusardi and Bornhorn moved for partial summary judgment.  (Doc. # 65).  Plaintiffs responded to each motion with a single response.  (Doc. # 81).  Officers Jordan and Gangwish (Doc. # 84), and Officers Lusardi and Bornhorn (Doc. # 83) filed a timely reply.

---

[1]  All claims for violations of the Kentucky Constitution were previously dismissed.  (Doc. # 38).

1

The Court held oral argument on each of the summary judgment motions on March 1, 2013. The parties were represented as noted in the Court's Minute Entry Order (Doc. # 87). At the outset of the argument, Plaintiffs' counsel conceded that many claims asserted in the Second Amended Complaint (Doc. # 32) were no longer viable in light of the discovery and, thus, voluntarily dismissed the following claims:

- All claims against Defendants Gangwish and Jordan;

- Count II (Section 1983 claim), Count IV (Fourteenth Amendment claim), Count VI (fabrication and destruction of evidence claim) as to all Defendants;

- Plaintiffs Principata, Miller, Martin, Elias, and Lewis's claims in Count V (deliberate indifference) as to all Defendants;

- Plaintiff Gonzalez, Principata, Miller, Martin, and Elias's claims in Count VII (malicious prosecution) as to all Defendants; and

- Plaintiff Lewis's claims in Count VII (malicious prosecution) as to Defendants Fulton, Dames, and Weitholder.

Based on Plaintiffs' concessions, the Court granted Defendant Jordan's (Doc. # 63) and Defendant Gangwish's (Doc. # 64) motions for summary judgment, as well as Defendants Bornhorn and Lusardi's (Doc. # 65) motion for partial summary judgment. Defendants Fulton, Dames and Weitholder's (Doc. # 66) motion for summary judgment was taken under advisement at the conclusion of oral argument for the Court to consider three issues: (1) whether Defendants Fulton and Dames are entitled to summary judgment on Plaintiff Miller's excessive force and battery claims; (2) whether Defendant Weitholder is entitled to summary judgment on Plaintiff Martin's excessive force and battery claims; and

(3) whether Defendants Fulton, Dames and Weitholder are entitled to summary judgment on Plaintiff Gonzalez's deliberate indifference claim.

Having considered the parties' memoranda and oral arguments, as well as the evidence of record, the Court will **deny** Defendants Fulton and Dames motion for summary judgment on Plaintiff Miller's excessive force and battery claims, as well as Defendant Weitholder's motion on Plaintiff Martin's excessive force and battery claims.  The Court will **grant** Defendants Fulton, Dames and Weitholder's motion on Plaintiff Gonzalez's deliberate indifference claim.   Additionally, the Court will enter judgment in favor of Defendants Bornhorn and Lusardi on Plaintiff Gonzalez's deliberate indifference claim pursuant to Federal Rule of Civil Procedure 56(f)(1).

## II.  FACTUAL BACKGROUND

On the evening of July 17, 2009, Plaintiffs Anthony Gonzalez, Lisa Lewis, Michael Martin, Betsy Miller, and Theresa Principata gathered at the residence of Plaintiff Shai Elias on Greenup Street in Covington, Kentucky, for a barbeque.  The Plaintiffs socialized around a bar on the backyard patio while eating, drinking alcoholic beverages and listening to music.

At approximately 11:00 p.m. that evening, a neighbor called the Covington Police Department to complain about loud noise coming from the 700 block of Greenup Street. At approximately 11:38 p.m., Officers Michael Lusardi, Joshua Bornhorn and an unidentified ride-along arrived on-scene and identified the Elias residence as the source of the loud music.  Officer Lusardi "spied" on the Plaintiffs for approximately 12 minutes

before confronting them, fearing that they might have an Uzi machine gun.[2]

Officers Lusardi and Bornhorn, and the ride-along eventually entered the backyard through a side gate.  Other officers entered the backyard soon thereafter.  As Officer Lusardi entered, he told Theresa Principata that the music was too loud and it needed to be turned down.  Principata said, "okay."  Lusardi then pushed Principata aside and moved toward the group standing around the bar.

Spotting a cooler full of beer, Lusardi said, "look what we got here: Beer . . . I hope everybody is 21 and older, and are there any drugs here?"  (Doc. # 74-1 at 20).  Anthony Gonzalez responded, "everybody here [is] at least 21 and older, and . . . there are no drugs here, officer."  (*Id.*).  Officer Lusardi then asked whether Gonzalez was the owner of the home, provoking the following encounter as described by Gonzalez:

> He asked me if I was the owner of the house.  I said no.  He told me to shut up, keep my mouth quiet, and go inside.  That's when I said, you don't have to be an ass about it.  That's when the police officer grabbed me and threw me in the ground and handcuffed me.  I was picked up, hit in the stomach; I dropped to the ground, and that's when one of the officers kicked me right in the face.

(*Id.*).  Gonzalez later clarified that he began to go into the house as directed by Lusardi, but was prevented from doing so when he was taken to the ground by Officers Lusardi and Bornhorn.  Gonzalez also testified that he was lying motionless on the ground as the officers kicked and punched him.  However, another Plaintiff recalls hearing that Gonzalez was "scooting kind of on his butt while he was handcuffed and pounding his feet into somebody's chest."  (Doc. # 75-1 at 54-55).

---

[2] It is not evident from the record why Officer Lusardi feared the Plaintiffs might be in possession of an Uzi machine gun.

Officers eventually picked Gonzalez off the ground and searched his pockets. Officer Bornhorn found Gonzalez's photo ID in his wallet and identified him as Aglisberto Gonzalez. Bornhorn told Gonzalez, "I hate fucking spics," – a derogatory term used to describe Spanish-speaking Latinos. (Doc. # 74-1 at 24, 66). Gonzalez was then placed in a police vehicle. While there, Officer Sarah Lusardi – not a defendant in this matter – approached Gonzalez to photograph his injuries, consisting of a black eye and bruises to his back and arms. Gonzalez explained his interaction with Sarah Lusardi as follows:

> When Sarah Lusardi opened the door, she was wanting to take my picture. I told her that I needed medical attention, that I was badly hurt; I was kicked in the face, and I needed an ambulance. At that moment, all she was worried about was taking the picture. And I told her that if she can please call an ambulance; I needed medical attention, that was basically it. She just took my pictures and slammed the door and left.

(*Id.* at 25).

In shock from Officer Lusardi and Bornhorn's actions, Betsy Miller told the officers that what they were doing "wasn't right." Miller was then pushed from behind, although she does not know who pushed her. She fell face first to the ground, hitting her nose and chin. Miller tried to lift her head up to see what was going on, but officers pushed her head back down. An officer "took [her] arms really hard and arrested [her] with the cuffs." (Doc. # 75-1 at 30). Miller yelled "ow," expressing her discomfort to the officers, but her complaints went unnoticed. According to Miller, she never physically resisted arrest or screamed at the officers. (*Id.* at 31). However, a uniform citation indicates that Miller yelled at officers and had to be physically restrained by a friend at some point. When officers attempted to place her under arrest, "she began pulling away and twisting her arm in an attempt to get away." (Doc. # 65-3).

During her deposition, Miller was never able to identify her arresting officer or any other officer that exerted force on her (Doc. # 75-1 at 28, 31, 61).  At best, Miller recalled that Officers Fulton and Dames signed a uniform citation which charged her with resisting arrest, disorderly conduct and alcohol intoxication.  However, the Court has reviewed the uniform citation and sees no indication that it was either Officer Fulton or Dames who arrested Miller.  In fact, the citation states generally that "when officers grabbed a hold of [Miller] and informed her she was under arrest she began pulling away and twisting her arms in an attempt to get away."  (Doc. # 65-3).  Fulton and Dames made it abundantly clear in their motion for summary judgment that Miller was unable to identify which officer used force against her.  (Doc. # 66-1 at 11).

However, at oral argument, Fulton and Dames' counsel effectively conceded that they arrested Miller.  Counsel discussed Dames' testimony during Miller's state criminal trial at length, wherein Dames indicated that he and Fulton restrained Miller and arrested her, to argue that the force used was reasonable.  Although the state-court testimony is not a part of the record, defense counsel's reliance on details of  the testimony amounts to a concession that Dames and Fulton were, in fact, the officers who arrested Miller and used force against her.  This concession is an "admission" under Federal Rule of Civil Procedure 56(c)(1)(A) and may, therefore, be considered in adjudicating the summary judgment motion.  *See, e.g., United States v. Burns*, 109 F. App'x 52, 58 (6th Cir. 2004) (holding that statements made in a brief may be deemed judicial admissions so long as the statement is deliberate, clear and unambiguous); *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Arioli*, 941 F. Supp. 646, 655 (E.D. Mich. 1996) (holding that representations of counsel that are adverse to client are treated as admissions so long as the representations are not

6

inadvertent); *American Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988) ("Factual assertions in pleadings and pretrial orders, unless amended, are considered judicial admissions conclusively binding on the party who made them."); 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* 2722m pp. 375-376 (1998) ("Rule 56(c) permits the court to consider any 'admissions on file.' The quoted words make it clear that the admissions need not be pursuant to Rule 36; they may have. . . occurred during the oral argument on the motion . . . .").

Plaintiff Michael Martin stood by watching the police arrest his girlfriend, Betsy Miller, and Gonzalez. Martin watched as Gonzalez was kicked in the face, which prompted him to ask his friend if he was okay. Gonzalez responded, "No," and asked the officer to call an ambulance several times. (Doc. # 77-1 at 10-11). Martin also asked the police to call an ambulance for Gonzalez. Martin then asked the ride-along "if he saw what they did to Anthony and that he needs an ambulance." (Doc. # 77-1 at 11). The ride along ignored his question.

Martin then saw "[Miller] get slammed to the ground, and an officer on her back yanking her arms behind her back . . . ." (*Id.*). Martin exclaimed, "what is going on?" (*Id.*). Although Martin testified that he did not say or do anything else, a police report states that Martin charged towards officers as they were placing Miller under arrest. Officer Weitholder apprehended Martin by pulling his arms behind his back and placing him in handcuffs. According to the police report, Martin then said, "don't you fucking touch me!" (Doc. # 77-2 at 28). However, Martin testified that he merely asked, "What is going on?" (Doc. # 77-1 at 12). Officer Weitholder then pushed Martin's arms above his head and shoved him forward, forcing him to run. While running, Officer Weitholder threw Martin to

his knees on three occasions, lifting him up each time only to throw him down a short time later.  The two eventually made it to a police vehicle where Officer Weithholder threw Martin into the fender and then shoved him into the backseat.

Plaintiff Lisa Lewis also voiced her displeasure about how Officers Lusardi and Bornhorn were treating Gonzalez.  As the officers were taking Gonzalez to the ground, Lewis said, "why are you doing that to him?  He didn't do anything wrong."  Lewis said nothing else to the police and did not physically interfere with the officers as they arrested Gonzalez.  (Doc. # 76-1 at 18).  After Gonzalez was placed in handcuffs, Officer Bornhorn turned to Lewis and shoved her in the face with the heel of his hand causing her to fall backwards.  (*Id.* at 18-19).  As she fell, another officer grabbed her and placed her in handcuffs.  She was then escorted to a police vehicle.

Plaintiff Shai Elias was inside his house changing the music as his friends struggled with the police.  He recalls going to his backdoor and seeing "Gonzalez getting thrown around like a rag doll with at least three, maybe four police officers on him . . . ."  (Doc. # 78-1 at 28).  Elias opened the door to check on his friend and saw the other Plaintiffs standing around in fear.  Elias said to his friends, "don't worry everybody . . . I've got a camera; I'm going to take pictures."  He then pulled out a camera phone and began taking pictures of the officers on top of Gonzalez.

Plaintiff Theresa Principata recalled seeing three flashes from Elias's camera phone.

[Elias] is taking the pictures.  I see – there's a ton of police officers on top of [Gonzalez].  I see Officer Bornhorn kick [Gonzalez] in the head, and on that last flash where [Elias] takes the picture, I guess that's when [the officers] notice that they're getting their pictures taken, and several officers rush over, grab [Elias], the phone goes flying out of his hand, and he is taken into the air.

(Doc. # 79-1 at 38).

Elias testified that Officers Bornhorn and Lusardi "bull-rushed" him as he was snapping a third picture. (Doc. # 78-1 at 34, 35). One of the officers grabbed his shoulders as the other grabbed his legs, and then Elias hit the ground. He was unable to recall exactly what happened because he was knocked unconscious either from the force of the officers' initial contact or from hitting the ground. When he regained consciousness, he remembers lying face down as Officers Lusardi and Bornhorn had their knees in his arms, shoulders and back. The officers then placed Elias in handcuffs and took him to a police cruiser.

Meanwhile, Theresa Principata was the only Plaintiff remaining in the backyard. An officer approached her, directed her to put her hands behind her back, and then handcuffed her. He informed her that she was under arrest and took her to a police vehicle. Eventually, each of the Plaintiffs were taken to jail and charged with various criminal violations. Most of the Plaintiffs were released within a few hours.

Gonzalez, however, was not immediately released. As Gonzalez was going through the in-take process at the Kenton County Detention Center, he asked a Deputy Sheriff if a nurse could examine his right eye, which showed signs of bruising and inflammation. (Doc. # 74-3). According to the physician's report, Gonzalez did not complain about any other injury. The nurse ordered that Gonzalez be given ice[3] to help with the swelling pursuant to the doctor's orders, however Gonzalez was not examined because another Deputy Sheriff, Staff Sergeant England, advised that Gonzalez was too disruptive.

---

[3] At his deposition, Gonzalez denied that a nurse or doctor considered his injuries and provided him treatment while at the Kenton County Detention Center. Gonzalez also denied that he was ever given ice.

Gonzalez was ultimately released three days after his arrest.

Gonzalez visited the emergency room at St. Elizabeth Medical Center shortly after his release from jail in order to receive treatment for injuries he suffered during his arrest. Gonzalez complained of injuries to his eye, wrist, nose, back and stomach, particularly his kidneys. (Doc. # 74-3 at 8-9). He also complained of a headache. (*Id.*). After conducting a physical examination and reviewing a CT scan of Gonzalez's head, Dr. David Sower rendered the following report:

> Patient has a contusion under right eye. CT negative. Unremarkable exam. Otherwise he complains of diffuse muscle soreness, but there are no other identifiable abrasions, contusions or evidence of trauma. He generally appears well. No distress, he should do fine with simple over the counter tylenol or motrin. May use heating pad for muscle aches.

(Doc. # 74-3 at 10). Additionally, after examining Gonzalez's abdomen, Dr. Sower found that it was soft and not tender to palpation, there was no evidence of external trauma, and his bowels sounded normal. Gonzalez was discharged from the hospital just over two hours after he arrived.

Each of the Plaintiffs were eventually charged with resisting arrest, alcohol intoxication and disorderly conduct in the second degree for their actions on the evening of July 17, 2009. (Docs. # 65-1 at 1; 65-2; 65-3; 65-4; 65-5; 65-6). Anthony Gonzalez was also charged with assault in the third degree, while Theresa Principata and Shai Elias were also charged with violating the city noise ordinance.

A police report accompanying Gonzalez's citation recounts a version of events that is remarkably different from those described by the Plaintiffs:

> Seeing that everyone was drinking, we asked if everyone was at least twenty one. That is when Gonzalez began to cause a disturbance by raising his voice and using profanity such as "fuck." Officer Lusardi asked Gonzalez to

leave the table and talk to us away from the others.  Gonzalez got loud and again used profanity.   At the time we attempted to arrest Gonzalez. Gonzalez began to pull away as we attempted to put handcuffs on him.  He tensed up his muscles and resisted to the point where force was necessary to take him to the ground.  *Once on the ground, the others started to yell and scream at us.  Stating that we didn't have the right to arrest him and that it was wrong.  They all grabbed at us and made it difficult to get the cuffs on Gonzalez.*  As we were getting Gonzalez in custody we asked for more cars due to the other[s] getting more aggressive.  We then attempted to arrest Martin, as we did, Gonzalez who was on the ground, began to kick me and Officer Lusardi's ride along, Darren Simms.  Gonzalez then quickly turned his attention to Officer Lusardi, who he kicked several times in the abdomen. This caused substantial pain to the three of us. Officer Lusardi's uniform was damaged during the assault.  *At this point the others were still grabbing at the officers and yelling.*  Once Gonzalez was subdued and Martin was taken into custody, other officers began to arrive.  Elias, Lewis, Miller and Principata were all taken into custody for alcohol intoxication, disorderly conduct 2nd and resisting arrest.

(Doc. # 65-1 at 3) (emphasis added).

All of the Plaintiffs, with the exception of Lisa Lewis, were convicted of some or all of the charges against them.  Specifically, Anthony Gonzalez was found guilty of resisting arrest and misdemeanor assault.  (Doc. # 74-1 at 27).  Shai Elias was found guilty of resisting arrest, disorderly conduct and a noise violation.  (Doc. # 78-1 at 90).  Betsy Miller was found guilty of disorderly conduct.  (Doc. # 75-1 at 36).  Michael Martin was found guilty of resisting arrest and disorderly conduct.  (Doc. # 77-1 at 13).  Finally, a jury found Theresa Principata not guilty of disorderly conduct or resisting arrest, but guilty of violating the city noise ordinance.  (Doc. # 79-1 at 59).

In light of the foregoing events, Plaintiffs filed this § 1983 action on July 1, 2010. Plaintiffs assert seven claims in their second amended complaint.  (Doc. # 32).  Count I asserts a state-law battery claim against Officers Lusardi, Bornhorn, Fulton, Dames, and Weitholder; Count II alleges that all Defendants are liable for violations of 42 U.S.C. § 1983;

11

Count III alleges that Officers Lusardi, Bornhorn, Fulton, Dames, and Weitholder used excessive force in violation of the Fourth Amendment; Count IV alleges that all Defendants violated the Plaintiffs' Fourteenth Amendment Due Process rights; Count V alleges that all Defendants are liable for being deliberately indifferent to Gonzalez's, Elias's and Martin's serious medical needs; Count VI[4] alleges that all Defendants are liable for fabricating and destroying evidence; and, finally, Count VII alleges that all Defendants are liable for maliciously prosecuting Principata, Miller, Lewis, Martin, and Elias.

## III.  ANALYSIS

### A.    Standard of Review

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The "moving party bears the burden of showing the absence of any genuine issues of material fact." *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008).  The moving party may meet this burden by demonstrating the absence of evidence concerning an essential element of the nonmovant's claim on which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Once the movant has satisfied its burden, the nonmoving party must "do more than simply show that there is some

---

[4]  The Second Amended Complaint lists two counts as "Count V": the deliberate indifference count and the destruction and fabrication of evidence count.  For purposes of clarity, the Court will refer to the counts as follows: Count V - Deliberate Indifference; Count VI - Fabrication and Destruction of Evidence; Count VII - Malicious Prosecution.

metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, it must produce specific facts showing that a genuine issue remains. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000). If, after reviewing the record in its entirety, a rational fact finder could not find for the nonmoving party, summary judgment should be granted. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).

Moreover, the trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001).

### B.   Count III – Excessive Force

In their Second Amended Complaint, all Plaintiffs assert excessive force claims against Officers Lusardi, Bornhorn, Fulton, Dames and Weitholder. However, Plaintiffs conceded that they will only pursue the following excessive force claims: (1) Plaintiff Gonzalez against Officers Bornhorn and Lusardi; (2) Plaintiff Elias against Officers Bornhorn and Lusardi; (3) Plaintiff Principata against Officer Lusardi; (4) Plaintiff Lewis against Officer Bornhorn; (5) Plaintiff Miller against Officers Dames and Fulton; and (6) Plaintiff Martin against Officer Weitholder. To the extent that Plaintiffs originally asserted additional excessive force claims, Officers Lusardi, Bornhorn, Fulton, Dames and Weitholder are granted summary judgment on those claims.

Officers Dames and Fulton now move for summary judgment on Plaintiff Miller's excessive force claim, and Officer Weitholder moves for summary judgment on Plaintiff

13

Martin's claim.  The officers assert that they are entitled to qualified immunity because the Plaintiffs cannot demonstrate that they were subjected to excessive force.  Plaintiffs respond that the officers are not entitled to immunity because there are sufficient facts in the record to show that the force was excessive, and that the officers' conduct was unreasonable in light of clearly established law.  Because the record is replete with disputed issues of material fact, the Court finds that none of the officers are entitled to qualified immunity on the excessive force claims.

Qualified immunity is an affirmative defense that shields "government officials from performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In determining whether qualified immunity is warranted, the Sixth Circuit instructs district courts to apply a two-part test. *Sigley v. City of Parma Heights*, 437 F.3d 527, 536-37 (6th Cir. 2006).[5]  First, the court must determine whether the plaintiff has established a violation of a constitutional right . *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  "Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." *Id.*

In order to hold an officer liable for excessive force, the plaintiff must prove that the officer: (1) actively participated in the use of force; (2) supervised the officer who used

---

[5]  Some panels of the Sixth Circuit apply a three-part test instead.  *Grawey v. Drury*, 567 F.3d 302, 309 (6th Cir. 2009).  The third step requires "the court to determine whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively reasonable in light of the clearly established constitutional right."  *Id.*  However, in excessive force cases the court must ask whether the officer's use of force was objectively unreasonable in order to find a constitutional violation under the first step, making it redundant to ask the same question in a third prong.  *Id.*  "Thus, qualified immunity in excessive force cases is a two-step analysis."  *Id.*

excessive force; or (3) owed the victim a duty of protection against the use of excessive force. *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997).

Whether the force was excessive is governed by the Fourth Amendment's objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). To determine whether the seizure was reasonable, the Court must carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (internal quotations omitted). This requires "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

The reasonableness of the force must be judged from the perspective of a reasonable officer on the scene. *Id.* "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* (internal quotations omitted). The reasonableness inquiry must allow "for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 397.

> **(1)** **Miller's state conviction for disorderly conduct, and Martin's state conviction for resisting arrest do not preclude them from asserting excessive force claims against the officers**

In their motion for summary judgment, the officers argue that Miller and Martin's convictions preclude them from asserting excessive force claims. The officers offer no justification for this argument aside from citing *Gossage v. Roberts*, 904 S.W.2d 246, 248

15

(Ky. 1995) for the proposition that "[u]nder proper circumstances criminal convictions may be used for collateral estoppel in later civil proceedings."  Counsel reiterated this general proposition at oral argument, but offered no supporting justification.

In *Donovan v. Thames*, 105 F.3d 291 (6th Cir. 1997), the Sixth Circuit specifically addressed the argument that a resisting arrest conviction from a Kentucky court precludes a subsequent § 1983 claim for excessive force.  As Defendants do in this case, the Sixth Circuit began by discussing the Kentucky Supreme Court's decision in *Gossage*.  *Id.* at 295.  The *Gossage* Court stated:

> The general rule is that a judgment in a former action operates as an estoppel only as to matters which were necessarily involved and determined in the former action, and is not conclusive as to matters which were immaterial or unessential to the determination of the prior action or which were not necessary to uphold the judgment.

*Id.* (quoting *Gossage*, 904 S.W.2d at 248-49).  With *Gossage* in mind, the Sixth Circuit found that, under Kentucky law, "the offense of resisting arrest does not require a finding that the police officers did not use excessive force in effecting the arrest."  *Id.* (citing K.R.S. § 520.090).  As a result, the issue of excessive force is not necessarily involved or determined in the state-court action.  *Id.*  And when there is no other evidence that the issue of excessive force was previously litigated, the Sixth Circuit instructs that a resisting arrest conviction in Kentucky does not bar an excessive force claim in federal court.   *Id.*

*Donovan* squarely refutes Officer Weitholder's attempt to use Martin's resisting arrest conviction as a bar to this federal excessive force claim.  The Commonwealth was not required to prove absence of excessive force in Martin's state criminal case.  Moreover, Weitholder has not demonstrated that the issue of his use of force was even mentioned or litigated in state court.  Therefore, Martin is not precluded from bringing his excessive force

16

claim.

Because Miller was convicted of disorderly conduct in the second degree, *Donovan* is not directly applicable to whether her conviction bars this excessive force claim. However, the Sixth Circuit's rationale in *Donovan* compels this Court to find that Miller's excessive force claim is not barred.  Pursuant to K.R.S. § 525.060,

> A person is guilty of disorderly conduct in the second degree when in a public place and with intent to cause public inconvenience, annoyance, alarm, or wantonly creating a risk thereof, he:
>
> > (a) Engages in fighting or in violent, tumultuous, or threatening behavior;
> >
> > (b) Makes unreasonable noise;
> >
> > (c) Refuses to obey an official order to disperse issued to maintain public safety in dangerous proximity to a fire, hazard, or other emergency, or
> >
> > (d) Creates a hazardous or physically offensive condition by any act that serves no legitimate purpose.
>
> . . . .

Similar to resisting arrest, lack of excessive force is not an element of disorderly conduct. And there is no indication that excessive force, or a lack thereof, was actually litigated at Miller's trial.  As a result, Miller's disorderly conduct conviction does not bar her from pursuing an excessive force claim against Dames and Fulton.

Fulton, Dames and Weitholder also rely on *Heck v. Humphrey*, 512 U.S. 477 (1994) to assert that Martin and Miller cannot bring this § 1983 excessive force claim without first demonstrating that their convictions have been reversed, expunged, declared invalid, or called into question on federal habeas corpus review.  Again, however, the Sixth Circuit has directly refuted this argument.  In *Heck*, the Supreme Court held:

17

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.  A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983.

*Id.* at 486.  The Court went on to state:

> But if the district court determines that the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit.

*Id.* at 487.

In *Schreiber v. Moe*, 596 F.3d 323 (2010), the Sixth Circuit considered whether *Heck* was applicable to a § 1983 excessive force claim where the plaintiff was previously convicted of resisting arrest in Michigan.  Because Michigan law did not require the state to prove that police did not use excessive force as an element of resisting arrest, the Court held that an excessive force claim did not call into question the validity of a resisting arrest conviction.  *Id.* at 335-36.  Therefore, the *Schreiber* Court held that the *Heck* doctrine was not applicable to the plaintiff's excessive force claim.  *Id.*  Similarly, because lack of excessive force is not an element to a resisting arrest or disorderly conduct charge under Kentucky law, the *Heck* doctrine does not apply.

### (2)   Disputed issues of material fact preclude the Court from granting summary judgment in favor of the officers, even on qualified immunity grounds

#### (a)   Plaintiff Miller's excessive force claim against Officers Fulton and Dames

As *Graham v. Connor* instructs, the Court must determine whether Fulton and

18

Dames' use of force was reasonable under the Fourth Amendment.  *Graham*, 490 U.S. at 396.    The Court must consider the totality of the circumstances and give considerable attention to the following factors: (1)   the severity of the crime at issue, (2)  whether the suspect poses an immediate threat to the safety of the officers or others, and (3)  whether he is actively resisting arrest or attempting to evade arrest by flight.  *Id.*

Miller explains that she stood in shock watching officers punch and kick Gonzalez. She voiced her displeasure to the officers, stating, "that it wasn't right," though she never raised her voice.  (Doc. # 75-1 at 27).  According to Miller, she was then shoved to the ground by officers based on her statement.  She attempted to lift her head up, but officers shoved it back down.  Officers took her arms "really hard" and placed her in handcuffs. She told the officers they were hurting her, but the officers continued to pull her arms behind her back.  The officers finally lifted her up by the handcuffs and escorted her to a police car.  Miller testified that she never resisted.

Miller's citation, signed by Fulton and Dames, tells a different story.  When officers arrived, Miller and her co-plaintiffs were "yelling and confronting the officers," and Miller was being "physically restrained by a friend."  (Doc. # 65-3).  "When officers grabbed ahold [sic] of [Miller] and informed her she was under arrest she began pulling away and twisting her arms in an attempt to get away."  (*Id.*).  Fulton and Dames also observed that Miller was "manifestly under the influence of alcohol" as she "had obvious slurred speech and a strong odor of alcoholic beverages."  (*Id.*).   Miller was ultimately convicted of disorderly conduct in the second degree.

Because Miller's version of events is so remarkably different from those recounted by Dames and Fulton, the Court is precluded from entering summary judgment in favor of

the officers, even on qualified immunity grounds.  As the Sixth Circuit has held:

> Summary judgment would not be appropriate if there is a factual dispute (*i.e.* a genuine issue of material fact) involving an issue on which the question of immunity turns, such that it cannot be determined before trial whether the defendant did acts that violate clearly established rights.

*Poe v. Haydon*, 853 F.2d 418, 426 (6th Cir. 1988).  Because the material facts are disputed, the Court cannot say as a matter of law that Dames and Fulton's use of force was objectively reasonable.  Therefore, Dames and Fulton are not entitled to summary judgment on Plaintiff Miller's excessive force claim.

### (b)    Plaintiff Martin's excessive force claim against Officer Weitholder

The facts of Martin's arrest are also largely disputed.  Plaintiff Martin recounted the following series of events.  After seeing an officer kick Plaintiff Gonzalez in the face, Martin begged the officers to get an ambulance for his friend.  Officers refused.  Martin then watched as his girlfriend, Betsy Miller, was "slammed to the ground," an officer "yanked" her arms behind her back and drove his knee into her back  (Doc. # 77-1 at 11).  Confused by what was transpiring, Martin asked, "What is going on?"  Without responding, Officer Weitholder grabbed Martin's arms, pulled them behind his back, and placed him in handcuffs.  Weitholder then raised Martin's arms above his head and forced him to run. As they ran, Weitholder shoved Martin to the ground on three occasions, lifting him back to his feet after each fall.  At his deposition, Martin testified that he never resisted arrest.  However, Martin later conceded – appropriately so – that he did resist arrest at some point, a fact which has been conclusively established by his state court conviction.

Via Martin's citation, Officer Weitholder tells an entirely different set of facts. According to Weitholder, as "officers were attempting to place [Martin's] girlfriend under

arrest ... he stood up and started charging toward them.  When [Weithholder] stopped [him] from charging at officers, he said 'Don't you fucking touch me!" (Doc. # 65-4).  The citation also described Martin as having blood shot eyes, slurred speech and the odor of "intoxicants about his person."  (Doc. # 65-4).  Ultimately, as Officer Weithholder emphasizes, Plaintiff Martin was convicted of resisting arrest and disorderly conduct.  Based on his conviction, and the conduct of the co-plaintiffs, Weithholder asserts that his use of force was reasonable.

Although Martin was convicted of resisting arrest, the facts are disputed such that the Court is precluded from determining whether a constitutional violation occurred.  Most importantly, it remains unclear whether and when Martin stopped resisting arrest, and, similarly, whether he continued to present a threat to officers. Even if Martin charged at officers before being apprehended, Martin's testimony, if accepted by a jury, still establishes that he was compliant *after* he was in handcuffs and *before* Weithholder threw him to the ground.  If this were the case, a reasonable juror could find that Weithholder's use of force post-arrest was unreasonable.  As a result, the Court cannot enter summary judgment in Officer Weithholder's favor, even on qualified immunity grounds.  *See Poe v. Haydon*, 853 F.2d 418, 426 (6th Cir. 1988).

C.      **Count I - Battery**

Plaintiffs' battery claims mirror their excessive force claims.  As such, Plaintiffs have conceded that they will only pursue the following battery claims: (1) Plaintiff Gonzalez against Officers Bornhorn and Lusardi; (2) Plaintiff Elias against Officers Bornhorn and Lusardi; (3) Plaintiff Principata against Officer Lusardi; (4) Plaintiff Lewis against Officer Bornhorn; (5) Plaintiff Miller against Officers Dames and Fulton; and (6) Plaintiff Martin

against Officer Weitholder.  To the extent that Plaintiffs originally asserted additional battery claims, Officers Lusardi, Bornhorn, Fulton, Dames and Weitholder are granted summary judgment on those claims.

Officers Fulton and Dames move for summary judgment on Plaintiff Miller's claim, and Officer Weitholder moves for summary judgment on Plaintiff Martin's claim.  As with the excessive force claims, disputed issues of material fact preclude the Court from granting judgment in favor of Officers Fulton, Dames and Weitholder on Plaintiffs' battery claims.  Although the officers are entitled to qualified official immunity under *Yanero v. Davis*, 65 S.W.3d 510, 521-22 (Ky. 2001) if they used force in good faith, the facts surrounding Miller and Martin's arrest remain disputed such that the Court cannot make this determination.  Accordingly, Officers Fulton, Dames and Weitholder's motion for summary judgment on Miller and Martin's battery claims, respectively, is denied.

### D.    Count V - Deliberate Indifference

In Count V, Plaintiffs assert deliberate indifference claims against all of the Defendants.  However, at oral argument Plaintiffs conceded that Gonzalez is the only plaintiff with a potentially viable deliberate indifference claim.  Based on this concession, Defendants are entitled to summary judgment on the deliberate indifference claims asserted by every plaintiff except Gonzalez.

Plaintiff Gonzalez asserts that each of the officers, with the exception of Officers Jordan and Gangwish, were aware of his serious medical needs, but refused to provide him

medical treatment.  Specifically, Gonzalez contends that he sustained a black, swollen eye[6]

after being kicked by Officer Bornhorn.  At oral argument, Gonzalez's counsel also argued

that he sustained a concussion, though there is no evidence to corroborate counsel's

assertion.[7]  After being kicked, Gonzalez requested an ambulance but his request was

ignored. Plaintiff Martin then asked Officers Bornhorn and Lusardi to call an ambulance,

but they refused.  Additionally, the other officers "likely" saw Gonzalez's injuries because

they were in close proximity to him, but none of them provided Gonzalez with medical care.

Officers Fulton, Dames, and Weithholder move for summary judgment on Gonzalez's

deliberate indifference claim, arguing that they are entitled to qualified immunity.

The Fourteenth Amendment Due Process Clause forbids officers from

"unnecessarily and wantonly inflicting pain" on a pretrial detainee with "deliberate

indifference" towards the detainee's serious medical needs.  *Blackmore v. Kalamazoo*

---

[6] Gonzalez testified during his deposition that he sustained other injuries, including bruises to his arms and back.  He also reported stomach pain to a doctor as St. Elizabeth Medical Center on the day he was released from jail.  However, in his Second Amended Complaint, Gonzalez only complains that the officers were deliberately indifferent to his eye swelling.  Therefore, the Court will only consider Gonzalez's claim with respect to that injury.

[7] Gonzalez has not cited, nor is the Court aware of any evidence that suggests he sustained a concussion as a result of being kicked in the head.  When Gonzalez was being processed at the Kenton County Detention Center on July 18, 2009, a nurse reported that Gonzalez only complained of swelling to his right eye.  The report does not suggest that Gonzalez ever complained of an injury to his head.  However, at his deposition, Gonzalez testified that he never met with a nurse or doctor at Kenton County Detention Center, as reported by the Kenton County Detention Center "Physician's Written Orders/Inmate Medical Record."
    At 3:13 p.m. on July 20, 2009, less than 72 hours after his arrest, Gonzalez reported to St. Elizabeth North Emergency Department.  (Doc. # 74-3 at 9).  At that time, he complained of a headache among other injuries.  A subsequent physical exam revealed no neurological abnormalities.  (*Id.* at 10).  In fact, Gonzalez was described as having "good co-ordination. Alert, oriented to person, place, and time . . . No motor deficit. No sensory deficit."  (*Id.*).  Gonzalez also underwent a CT scan of his head based on his report that he had been kicked.  That CT scan revealed the following:
        Ventricular size and configuration are normal.  No mass-effect, midline shift, extra-axial fluid collection, abnormal parenchymal attenuation, or evidence of acute intracranial hemorrage. No fracture is seen.  Included paranasal sinuses and tympanomstoid cavities clear.
(*Id.* at 13).  Dr. Sower reported that Gonzalez's CT scan was negative.  None of this evidence suggests that Gonzalez had a concussion; in fact, it appears doctors determined Gonzalez did not have a concussion.

*Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004).  An officer's "deliberate indifference violates [this] right when the indifference is manifested by [officers] in intentionally denying or delaying access to medical care for a serious medical need."  *Id.* (internal citations omitted).

When a plaintiff asserts that he has been denied medical care, as Gonzalez alleges here, the Court must analyze the claim under both an objective and subjective component. *Id.*  Here, Gonzalez has not set forth sufficient evidence to satisfy the objective component. This component requires the plaintiff to demonstrate a "sufficiently serious" medical need by showing that it created a "substantial risk of serious harm" or unnecessary pain and suffering when left untreated.  *Id.*  The component may be satisfied in one of two ways. First, the plaintiff may show his needs were sufficiently serious "where facts show an obvious need for medical care that laymen would readily discern as requiring prompt medical attention by competent health care providers."  *Id.* at 898.  Second, if the injury is not "obvious," the plaintiff may establish that it was "sufficiently serious" by setting forth "verifying medical evidence" showing the detrimental effect of the delay in treatment.  *Id.* (citing *Napier v. Madison Cnty.*, 238 F.3d 739 (6th Cir. 2001)).

Gonzalez contends that he has met the objective component because a layperson, Martin, did in fact recognize that he needed prompt medical attention.  This is evinced by the fact that Martin requested an ambulance on Gonzalez's behalf. However, Gonzalez's argument asks the Court to draw its attention away from the severity of his alleged injury, and focus solely on Martin's request for an ambulance as prima facie proof of the objective component.  When the Court properly focuses on Gonzalez's injury – a swollen, black eye – it cannot conclude that this is an injury that a layperson would readily discern as requiring prompt medical attention by competent health care providers.  In fact, the Sixth Circuit has

24

held that a swollen eye is not the type of "obvious" injury that a layperson would perceive as requiring immediate medical assistance. *Cain v. Irvin*, 286 F. App'x 920, 926 (6th Cir. 2008); *see also Ford v. Davis*, 878 F.Supp. 1124, 1130 (N.D. Il. 1995) (holding that a swollen face, two black eyes, bruised ribs and a bruised back were not "serious wounds" that required immediate medical treatment); *Dallio v. Hebert*, 678 F.Supp.2d 35, 60 (N.D.N.Y. 2009) (holding that "two black eyes, bruising in his kidney area on his left side, kick marks and open lacerations on his knees, bruising and red spots on his thigh, lacerations on his arms and wrists, a headache, and numbness in his hands and fingers" were insufficient to establish a serious medical need).

Additionally, Gonzalez has not set forth "verifying medical evidence" to demonstrate the severity of his black eye. In fact, only the officers have put forth any of Gonzalez's medical evidence. Specifically, Gonzalez's medical report from St. Elizabeth Medical Center three days after his injury indicates that his injuries were minor at best. As Dr. Sower reported,

> Patient has a contusion under right eye. CT negative. Unremarkable exam. Otherwise he complains of diffuse muscle soreness, but there are no other identifiable abrasions, contusions or evidence of trauma. He generally appears well. No distress, he should do fine with simple over the counter tylenol or motrin. May use heating pad for muscle aches.

(Doc. # 74-3 at 10). This evidence does not show that Gonzalez suffered because of any delay or refusal to provide him treatment. Accordingly, Gonzalez has failed to satisfy the objective component of his deliberate indifference claim and, therefore, has failed to establish that Officers Fulton, Dames and Weitholder violated his Fourteenth Amendment rights. In light of this failure, the officers are entitled to summary judgment on this claim.

Although Officers Lusardi and Bornhorn did not move for summary judgment on Gonzalez's deliberate indifference claim, the Court will also grant summary judgment in their favor on this claim.  Pursuant to Federal Rule of Civil Procedure 56(f)(1), the Court is permitted to grant summary judgment in favor of a nonmovant after giving notice and a reasonable opportunity to respond.  At oral argument, the Court indicated that if it were determined that Gonzalez had failed to meet the objective component of *Farmer* by establishing a sufficiently serious medical need, that finding would be dispositive of Gonzalez's deliberate indifference claim against each of the plaintiffs.  None of the parties contested the Court's assertion.  As such, they have been given an adequate opportunity to respond.  Having failed to do so, the Court finds that Officers Lusardi and Bornhorn are entitled to summary judgment on Gonzalez's deliberate indifference claim.

## IV.  CONCLUSION

Accordingly, for the reasons stated herein, **IT IS ORDERED** as follows:

(1)     Defendants Fulton, Dames and Weitholder's Motion for Summary Judgment (Doc. # 66) is **granted in part and denied in part**. Defendants Fulton and Dames' motion for summary judgment on Plaintiff Miller's excessive force and battery claims, and Defendant Weitholder's motion for summary judgment on Plaintiff Martin's excessive force and battery claims are hereby **denied**.  However, Defendants Fulton, Dames and Weitholder's motion for summary judgment on Plaintiff Gonzalez's deliberate indifference claim is hereby **granted**.

(2)     Defendants Bornhorn and Lusardi are granted summary judgment on Plaintiff Gonzalez's deliberate indifference claim pursuant to Federal Rule of Civil Procedure 56(f)(1).

26

(3)     This matter is hereby set for a **telephonic status conference on March 20, 2013 at 11:00 a.m.** with all remaining parties to schedule a final pretrial conference and jury trial, and to discuss the possibility of alternative dispute resolution.  The Court will initiate the call utilizing counsels' contact information listed on the docket sheet.  If counsel prefers to be contacted at a different number, counsel must notify the Court **no later than 5:00 p.m. on March 19, 2013.**

This 12th day of March, 2013.



Signed By:

*David L. Bunning*

United States District Judge

G:\DATA\Opinions\Covington\2010\2-10-142 MOO granting & denying in part MSJ at DE 66.wpd